UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

TAMIKO RAZA, on behalf of Z.R., a minor,

     Plaintiff,

               13 Civ. 1963 (RWS)

 - against -

                OPINION

CAROLYN COLVIN,
Commissioner of Social Security

     Defendant.

----------------------------------------X

A P P E A R A N C E S:

 ATTORNEY FOR PLAINTIFF

 CHRISTOPHER JAMES BOWES
 54 Cobblestone Drive
 Shoreham, New York, 11786
 By:  Christopher J. Bowes, Esq.


 ATTORNEYS FOR DEFENDANT

 PREET BHARARA
 United States Attorney for the
 Southern District of New York
 86 Chambers Street, Third Floor
 New York, NY 10007
 By:  Brandon H. Cowart, Esq.

**Sweet, D.J.**

Plaintiff Tamiko Raza ("Raza" or "Plaintiff"), on behalf of Z.R., a minor, has moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the proceedings and review of an adverse decision of the defendant Carolyn Colvin (the "Commissioner" or "Defendant"), Commissioner of the Social Security Administration ("SSA"), denying disability benefits under the Social Security Act (the "Act"). The Commissioner has also cross-moved for judgment on the pleadings. Based on the conclusions set forth below, the Plaintiff's motion is denied and the Defendant's motion is granted.

## I.    **Procedural History**

Raza applied for Supplemental Security Income ("SSI") childhood disability benefits on behalf of Z.R. on December 29, 2010. Tr. 51, 93-101.[1] On February 25, 2011, the SSA denied Z.R.'s claim for benefits by initial determination. Tr. 52-55. Raza appealed the initial denial of benefits and on November 2, 2011, appeared with Z.R. at an administrative hearing (the "Hearing") in the Bronx before Administrative Law Judge Kenneth Scheer (the

---

[1] All references to "Tr. ___ " are to the numbered pages of the SSA Administrative Record. Dkt. No. 13 civ. 1963, ECF Nos. 13-15.

"ALJ").

On November 16, 2011, the ALJ issued a decision denying Z.R.'s claim (the "ALJ Decision"). Tr. 7-27. The ALJ determined that the functional limitations resulting from Z.R.'s impairments neither met nor equaled the listing of impairments and that the functional limitations were not functionally equivalent to a listed impairment under the special rules for children. The ALJ concluded that Z.R. experienced "less than marked" limitations in the six domains considered: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for self, and general health and physical well-being. Tr. 25-26.

On February 22, 2013, the Appeal Council denied review, making the ALJ Decision the final decision on Raza's application for disability benefits for Z.R. Tr. 1-3.

Plaintiff filed the complaint (the "Complaint") in the instant action on March 21, 2013 seeking review of the ALJ Decision. The instant motion was filed on November 30, 2013. The matter was marked fully submitted on April 16, 2014.

## II.  Statement of Facts

2

a.   *SSI Application Evidence and Hearing Testimony*

Z.R. was born in November 2000. Tr. 93. Plaintiff is Z.R.'s mother. Tr. 33. In December 2010, Raza applied for SSI on behalf of Z.R. Plaintiff contends that Z.R. was disabled based on her speech delay, attention deficit hyperactivity disorder ("ADHD"), learning disability, asthma, Hashimoto's thyroiditis, and scoliosis. Tr. 124. In a questionnaire for the New York State Office of Temporary and Disability Assistance, Raza noted that Z.R. has problems when around other people and with her speech, self-care activities, how she plays with others, and her school performance. Tr. 132. Plaintiff noted that Z.R. suffers from attention deficit disorder ("ADD") and is on medication. *Id.* Z.R. also had difficulty repeating stories that she had heard, telling jokes or riddles accurately, and explaining her actions. Tr. 113. She did not use conditional phrases in her speech and could not read or understand simple instructions or stories in books or magazines. Z.R. also had difficulty writing simple stories, did not understand money (*i.e.*, making correct change), and could not tell time. Tr. 114. Raza noted that Z.R. did not get along well with adults or teachers and did not play any team sports. Tr. 116.

At the Hearing, Z.R. testified about her activities in

and out of school. Z.R. testified that she was doing "good" in school and that she had two best friends for several years. Tr. 40-41. She also testified that she uses a computer, has a Facebook page, and likes to play video games. Tr. 39. Z.R. further stated that she walks ten blocks to school, and although she sometimes has pain in her back when she is walking she generally walks pain free. Tr. 38. She testified that she participates in gym at school, but carries an asthma pump as a precaution. Tr. 39. Z.R. testified that she plans to be a school teacher. Tr. 40.

Plaintiff provided testimony at the Hearing regarding the diagnosis of Z.R.'s ADHD. According to Plaintiff, Z.R. had always been a slow learner but her hyperactivity was noticed in the first grade. Tr. 44. Her ADHD symptoms were later identified by practitioners at the Briggs Family Pediatrics ("Briggs"), the clinic where Z.R. received general medical care. Tr. 35. In 2009, Z.R. was referred to specialists at the Children's Neuroscience Center of St. Luke's – Roosevelt Hospital Center (the "Neuroscience Center") for treatment. Tr. 35, 312-314.

Plaintiff also testified to Z.R.'s difficulties at school and home. She explained that at home, Z.R. exhibited temper tantrums, had significant mood swings, and bickered with her sister. Tr. 47-48. Concerning school, Plaintiff testified that

4

Z.R. repeated the second grade, Tr. 45, she would not do her homework, and Z.R.'s teachers often complained about Z.R.'s lack of concentration in school. Tr. 47-48. Plaintiff reported, however, that since taking Focalin Z.R. was doing "way better" as to her ADHD symptoms. Tr. 45. According to Plaintiff, Z.R., in fifth grade at the time of the Hearing, continued to receive extra teacher assistance when needed. As to Z.R.'s speech impediment, Plaintiff testified that Z.R. was "speak[ing] very well" and Plaintiff was unsure if she was receiving speech therapy. Tr. 43.

Z.R. takes Levothyroxine, 50 mg, for her hypothyroidism, a health problem since August 2009. Tr. 43, 252. Z.R. has scoliosis, but neither surgery nor braces had been recommended for treatment. Tr. 45. For her asthma, Z.R. visited the hospital emergency room two or three times in 2010. Tr. 45-46. Z.R. was not hospitalized, but was instructed to use her asthma nebulizer machine at home. Tr. 46. Plaintiff testified that Z.R. exhibited various types of apparent obsessive-compulsive behaviors, *e.g.*, excessive washing of hands, biting fingernails and toenails, sleeping with Plaintiff every night, and sleeping with her foot in her mouth. Tr. 46. At the time, Z.R. had not seen a psychiatrist for treatment of these behaviors. Tr. 35.

b.   *Medical Evidence*

5

1. *Briggs Family Pediatrics*

At the time of the Hearing, Z.R. received primary medical care from the Briggs Family Pediatrics. Drs. Carmen Lazala and Delsa Compres were Z.R.'s primary care physicians, and they monitored Z.R.'s overall physical and mental condition. Tr. 36, 43, 179, 259-70. Z.R.

In October 2007, Z.R., then six-, nearly seven-, years old, had been evaluated by her school due to poor performance. Tr. 257. The record indicates that Z.R. was in the second grade at the time, but functioning at a kindergarten/first-grade level. *Id.*

In June 2008, Z.R. saw Dr. Lazala, a pediatrician with a specialty in endocrinology. Tr. 256. At this visit, Z.R. was 48 inches tall and weighed 48 pounds at seven and a half years old. Dr. Lazala prescribed pediasure at this time. *Id.*

In August 2009, Z.R. was diagnosed with hypothyroidism. Tr. 252. At around this time, Z.R. was promoted to the third grade, but she received special education services in school. Tr. 275-77. On August 25, 2009, Z.R. was recalled to Briggs for high thyroid values. Tr. 252. At this visit, Z.R. was placed on

6

Synthroid for her hyperthyroidism.

On September 3, 2009, Dr. Lazala saw Z.R. for a follow-up of her thyroid disorder. Tr. 251. During this visit, Dr. Lazala received complaints of Z.R. experiencing hair loss and weigh gain. *Id.* The examination revealed tachardia, proptosis, eye nerve palsy, tongue fasciculation, hypertension, and tremors. Dr. Lazala prescribed Synthoid 50 mcg at this visit. *Id.*

On May 3 and 7, 2010, Dr. Lazala again saw Z.R. for her hypothyroidism. Tr. 248-49. Z.R. was taking Synthroid 75 mcg at this time. Z.R. was described as "very symptomatic" for her thyroid.

On October 5, 2010, Dr. Lazala reported that Z.R. was doing well with eating and sleeping. Tr. 269. Dr. Lazala reported that she was seeing a neurologist who prescribed Focalin and was to have a follow-up visit for a crooked spine. *Id.* At this visit, Raza complained that Z.R. chewed on her fingernails and toenails. *Id.* Dr. Lazala diagnosed Z.R. with acquired hyperthyoidism, attention deficit hyperactivity disorder, and idiopathic scoliosis. *Id.*

Z.R. received an x-ray on November 2, 2010, which

revealed thoracolumbar scoliosis with a 6 degree curvature at the T10 level of the thoracic spine and a dextroscoliosis at L3 measuring 6 degrees. Tr. 246.

On November 9, 2010, Dr. Lazala saw Z.R. for a follow-up. Tr. 267-68. She was treated for acquired hypothyroidism, scoliosis, strabismus, and asthma. Dr. Lazala's notes indicate that Z.R. was misbehaving at home and had ADD with a prescription for Focalin 10 mg. *Id.* Dr. Lazala also referred her to the scoliosis clinic. *Id.*

On December 22, 2010, Dr. Lazala saw Z.R. for a medication refill. Tr. 265. Z.R. reported decreased appetite and feeling abdominal and head pain. Dr. Lazala directed her to lower her dosage of Focalin to 5 mg help with her appetite. *Id.* Z.R. also received a blood test, which tested normal for her thyroid. Tr. 263.

On March 31, 2011, Dr. Lazala saw Z.R. for a medication refill. Tr. 263. Z.R. was on Synthroid and reported difficulties with school and learning, focusing, and concentration. *Id.*

On April 7, 2011, treating pediatrician and endocrinologist Dr. Carmen Lazala completed a medical report

regarding Z.R.'s functioning (the "April 7, 2011 Report"). Tr. 192-94. Dr. Lazala reported that she had treated Z.R. since August 2009 and had last treated her on March 31, 2011. She reported that she was treating Z.R. for hypothyroidism, ADHD, scoliosis, and asthma. The report notes that Z.R. had poor school performance and was originally on Focalin 10 mg daily as well as Synthroid 50 mg daily. Her symptoms included poor concentration and difficulty learning. *Id.*

Dr. Lazala opined that Z.R. had "marked" limitation in acquiring and using information indicated by difficulties in learning and comprehending new information, retaining and recalling learned material, reading and understanding written material, understanding and following oral directions, expressing ideas in words or gestures, and in the ability to solve problems. Tr. 192-94. Dr. Lazala also noted that Z.R. experienced "marked" limitation in attending and completing tasks as demonstrated by limitation in the ability to concentrate without adult supervision and to stay on task without being reminded, in working independently without bothering others, in completing tasks on time, and in the ability to sit still for at least 10 minutes. Tr. 194. Dr. Lazala reported that Z.R. was overactive, restless, and fidgety. Dr. Lazala further reported that Z.R. experienced moderate limitation in the health and physical well-being domain.

9

Tr. 194.

### 2.  Neurological Consultants

In the Briggs' medical records, the earliest reference to Z.R.'s ADHD-like symptoms is in 2007. Tr. 285 (January 2007 medical note stating that Z.R. was "very hyper at home and school"). Dr. Compres diagnosed Z.R. as having ADHD in June of 2008. Tr. 282.

In April 2009, Z.R. was seen at St. Luke's - Roosevelt Hospital Center for complaints of concentration issues, being unable to sit in her chair, and being unable to hold still in school. Tr. 312. She was in second grade and struggled with math, speech, and language. At this visit, Raza complained of hyperactivity and an inability to control Z.R. at home or in stores. *Id.* She had poor impulse control (*e.g.*, she would open bags of chips in the stores). At this time, Z.R. was repeating the second grade. *Id.*

On August 14, 2009, Z.R. was seen for ADHD at the Neuroscience Center by Dr. Steven Wolf. Tr. 303. Her prescription for Focalin was renewed by Dr. Wolf. *Id.*

10

On May 14, 2010, Dr. Wolf again evaluated Z.R. Tr. 221-22. He diagnosed her with ADD and Encephalopathy. At this visit, Z.R. had an abnormal posture. She had run out of her medications for two months and the school was complaining about her not paying attention and not doing her homework. *Id.* Dr. Wolf directed Z.R. to restart the Focalin 10 mg for school but to stop for the summer. Tr. 221.

Focalin improved Z.R.'s behavior and performance at school and, to a lesser extent, her behavior at home in 2010 and 2011. On November 5, 2010, Nurse Practitioner Patricia McGoldrick saw Z.R. for an evaluation. Tr. 220. Plaintiff reported that Z.R.'s symptoms had improved dramatically, that she was "[d]oing much better at school," "[a]lmost to grade level," and "[p]aying attention in class and doing her homework," although Z.R. was not listening to her mother at home. Tr. 289. Plaintiff reported that earlier in the year Z.R. had not taken Focalin for two months and her ADD symptoms returned: she was "distracted," "not paying attention in school," and "not doing homework." Tr. 301. Once she began taking Focalin again, her ADD symptoms improved. *Id.* At the time, she had a diagnosis of ADD and Encephalopathy and was taking Focalin 10 mg, Levothyroxine 125 mcg, and Albuterol. She reported weight loss due to not eating since restarting the Focalin. *Id.* NP McGoldrick provided counseling for Z.R.'s medications at this

11

visit. *Id.*

On March 14, 2011, Z.R. saw NP McGoldrick for complaints of not eating breakfast or lunch at school. Tr. 297, 316. She was prescribed Focalin xr 10 mg.

Z.R. ran out of Focalin for two months in June and July of 2011, and her ADHD symptoms returned: Z.R. exhibited "behavior issues with hyperactivity, anger, and attention deficits." Tr. 295.

On August 26, 2011, NP McGoldrick saw Z.R. for an examination. At this visit, Z.R. was diagnosed with ADHD, Encephalopathy, and an abnormal posture. Tr. 219. Z.R. was reported to have a decreased appetite and Raza had to bring lunch to school to help Z.R. eat. Z.R. reportedly was performing well in school, receiving "3-4's" and was promoted to the fifth grade. Tr. 295. Plaintiff reported that Z.R. had "[n]o major issues when taking" Focalin. *Id.* NP McGoldrick prescribed to Z.R. Focalin 10 mg, Albuterol, Levothyroxine 50 mg, and Motrin. *Id.*

### 3. Other Physical Limitations

Z.R. has other physical limitations, specifically genu

12

valgum[2] and pronation of the feet.[3] Tr. 115. These physical limitations are not the basis of Z.R.'s disability application and were not challenged by Plaintiff in the Complaint or moving brief.

#### 4. Independent Medical Examinations

##### i. Dr. Joyce R. Schreiber

On February 10, 2011, Joyce R. Schreiber, Ed. D., examined at the Commissioner's request Z.R.'s cognitive ability. Tr. 173-78. Plaintiff told Dr. Schreiber that Z.R. was easily angered and annoyed, sometimes needed reminders to dress, bathe, and groom herself, but could feed herself and sometimes helped with household chores. Tr. 177, 173. Plaintiff also reported that Z.R. had friends and was close to her mother and family. Tr. 177.

Dr. Schreiber administered two tests. The first was the Wechsler Intelligence Scale for Children. Z.R.'s full scale score was 88, placing her in the low-average range of intelligence. Tr. 175. The second was the Wide Range Achievement Test-III, Reading

---

[2] Genu valgum, a/k/a knock knees, "is a condition in which the knees touch, but the ankles do not touch. The legs turn inward." *See* http://www.nlm.nih.gov/medlineplus/ency/article/001263.htm (last visited on July 16, 2014).

[3] Pronation of the feet is commonly referred to as flat feet. *See* http://www.nlm.nih.gov/medlineplus/ency/article/001262.htm (last visited on July 16, 2014).

Subtest, which measures an individual's ability to read words. Based on the results of the Wide Range Achievement Test-III, Dr. Schreiber concluded that Z.R. was reading at a fourth-grade level. Tr. 177.

On examination, Dr. Schreiber observed that Z.R.'s posture and motor behavior were normal, her eye contact was appropriate, and her speech and language abilities appeared adequate. Tr. 174. Z.R. was relaxed and comfortable throughout the testing session, exhibiting a deliberate, orderly style of responding to questions. *Id.* Her attention and concentration were good. *Id.* She worked with reflection and deliberation. *Id.*

Based upon her examination, Dr. Schreiber concluded that Z.R. was able to attend to, follow, and understand age-appropriate direction; complete age-appropriate tasks; adequately maintain social behavior; respond to changes in her environment; learn at her level of cognitive functioning; and ask questions and request assistance in an age-appropriate manner. Tr. 177. Dr. Schreiber added that Z.R. appeared able to be aware of dangers but might not take precautions in an age-appropriate manner. *Id.* She seemed capable of interacting adequately with peers and adults. *Id.*

ii. Dr. Thomas DePaola

14

On February 10, 2011, Dr. Thomas DePaola, a pediatrician, performed a physical examination of Z.R. at the Commissioner's request. Tr. 179-83. Plaintiff related Z.R.'s medical history, e.g., her hypothyroidism, ADHD, scoliosis, pronation of the feet with genu valgum, asthma, learning disability, and speech delay. Tr. 179. Plaintiff explained her concern that Z.R. might have obsessive-compulsive disorder because she washed her hands excessively. Tr. 179.

On examination, Dr. DePaola noted that Z.R. had normal appearance and behavior. Tr. 181. She related well and appeared to have a normal attention span. Tr. 181. She did not need help getting on and off the examination table. Tr. 181. Her gait was normal, as was her head, eyes, ears, nose, throat, chest, lungs, and heart. Tr. 181-82. Her extremities were normal except for valgus-pronation of both feet. Tr. 181. A review of her spine revealed that the left side of her back and her left shoulder were higher than the right. Tr. 182. Z.R.'s back and extremities had a normal range of motion and motor strength as did Z.R.'s upper and lower extremities. Tr. 182. Dr. DePaola could not elicit reflexes in the upper and lower extremities, although he was unsure whether this was due to a lack of cooperation. Tr. 182. Dr. DePaola suggested that Plaintiff follow-up with Z.R.'s pediatrician

regarding any suspected obsessive-compulsive disorder. Tr. 183.

Dr. DePaola diagnosed Z.R. with Hashimoto's thyroiditis, ADD, hyperactivity, scoliosis, pronation of the feet, genu valgum, asthma, a learning disability, speech delay, and maternal concern for obsessive compulsive disorder. Tr. 182-83. Dr. DePaola reported that Z.R. easily got frustrated at times with her learning and her behavior issues were consistent with ADD. *Id.*

### iii. Dr. J. Randall

On February 24, 2011, Dr. J. Randall, a state agency pediatric consultant, reviewed the medical evidence of record. Tr. 184-89. Dr. Randall considered Z.R.'s functioning in each of the six domains of functioning. *Id.* He determined that Z.R. had a less than marked limitation in the domains of acquiring and using information, Tr. 186, attending and completing tasks, Tr. 186, and health and physical well-being. Tr. 187. He determined that Z.R. had no limitation in the domains of interacting and relating with others, Tr. 186, moving about and manipulating objects, Tr. 187, and caring for herself. Tr. 187.

### c.   *Non-Medical Evidence*

### 1.   June 2010 Individualized Education Plan

A June 2010 New York City Department of Education Individualized Education Plan ("IEP") reveals that in the third grade Z.R. was classified with speech and language impairment. Tr. 226-37. She was described as a good reader but did not comprehend everything she read. Tr. 228. Her grammar and punctuation skills were generally weak, and her reading and listening comprehension skills were at the beginning of the second grade. *Id.* She reportedly did not speak clear words until three and a half years old and did not speak in sentences until four years of age. The IEP notes that Z.R. had received home speech and language therapy for one year.

### 2.   The October 2010 English Language Arts and Math Test Results

Z.R. achieved a score of 636 on the third grade English Language Arts test for the 2009-10 school year. Tr. 238-42. This translated to a performance level of 1, or below the standard. A performance level of 1 indicates that the student "does not demonstrate an understanding of the ELA knowledge and skills expected at this grade level." *Id.* Z.R. met the math proficiency requirements with a score of 3 for the third grade math standard.

17

3.    The January 31, 2011 Teacher Questionnaire

On January 31, 2011, Angela Maraglina ("Maraglina"), Z.R.'s fourth-grade special education teacher, completed a teacher's questionnaire which rated Z.R.'s ability to perform a variety of activities. Tr. 137-45. The questionnaire grouped the activities according to five broad "domains" of functioning and asked that each activity be rated on a 1 to 5 scale: 1 for "no problem," 2 for a "slight problem," 3 for an "obvious problem," 4 for a "serious problem," and 5 for a "very serious problem." Id. Z.R.'s engagement in activities are as follows:

Acquiring and using information domain: Maraglina rated Z.R. according to ten activities in this domain, concluding that Z.R. had either "no problem" or a "slight problem" in reading and comprehending written material, comprehending and doing math problems, understanding and participating in class discussions, learning new material, and applying problem-solving skills in class discussions. Maraglina rated Z.R. as having at most an "obvious problem" in the remaining activities grouped under this domain, i.e., comprehending oral instructions, understanding school and content vocabulary, providing organized oral explanations and adequate descriptions, expressing ideas in

18

written form, and recalling and applying previously learned material. Tr. 138. Overall, for the activities in the acquiring and using information domain, Z.R. exhibited no serious or very serious limitations. *Id.*

Attending and completing tasks domain: Maraglina rated Z.R. according to thirteen activities of this domain. She reported that Z.R. had either "no problem" or a "slight problem" in paying attention when spoken to directly, sustaining attention during play/sports activities, carrying out single-step instructions, waiting to take turns, changing from one activity to another without being disruptive, organizing her own things or school materials, and working at a reasonable pace/finishing on time. She rated Z.R. as having an "obvious problem" in the other domain activities, *i.e.*, focusing long enough to finish an assigned activity or task, refocusing to a task when necessary, completing class/homework assignments, completing work accurately and without careless mistakes, and working without distracting herself or others. Tr. 139.

The remaining three domains: Maraglina reported that Z.R. had "no problem" in the domains of interacting and relating with others, moving about and manipulating objects, and caring for herself. Tr. 140-43.

According to Maraglina, Z.R. did not frequently miss school due to illness. Tr. 143. Z.R. received special instruction in her regular class and speech-language therapy. Tr. 145. Maraglina described Z.R. as being independent in completing tasks, but needing redirection to stay focused. Tr. 138

### 4.    The April 28, 2011 Teacher Questionnaire

Maraglina completed a second teacher questionnaire on April 28, 2011. Tr. 210-17. In this questionnaire, Maraglina characterized Z.R.'s reading, math, and written language skills as having improved from a second-grade level (as reported in her January questionnaire) to a third-grade level. Tr. 137, 210. Maraglina noted some improvements to Z.R.'s specific abilities, including downgrading her to "no problem" in applying problem-solving skills in class discussions, and finding only one "obvious problem" in the set of "acquiring and using information" skills categories. Tr. 211. In the domain of attending and completing tasks, Maraglina found that Z.R. now had a "serious problem" in "focusing long enough to finish assigned activity or task" and "completing class/homework assignments" and an "obvious problem" in "paying attention when spoken to directly," "refocusing to task when necessary," "completing work accurately without careless

20

mistakes," "working without distracting self or others," and working at a reasonable pace/finishing on time." Tr. 212. Besides these issues, she reported that Z.R. had no other serious or obvious problems in the remaining three categories. Tr. 212. In the health and physical well-being domain Maraglina stated that Z.R.'s asthma caused her to be absent from school often. Tr. 216. With respect to the other two domains (Z.R.'s ability to interact and relate with others and ability to move about and manipulate objects), Maraglina characterized Z.R. as having no problems. Tr. 213-15.

### 5.   The May 4, 2011 Individualized Education Plan

A May 4, 2011 IEP noted that Z.R. had speech and language impairments and received speech and language services as well as integrated co-teaching for her impairments. Tr. 196, 202, 205. Z.R. was able to read short and simple paragraphs but became confused when reading longer text. Tr. 196. Her grammar and punctuation skills were generally weak. Z.R. was able to complete tasks even when given multi-step directions, followed steps to complete tasks, and was applying new educational strategies learned in class. Tr. 197.

The May 4, 2011 IEP further noted that Z.R. had no

behavioral problems but needed redirection to remain focused on tasks and that Z.R. was respectful of authority figures and related well with her peers. *Id.* Z.R. had appropriate fine motor skills, with neat handwriting and an ability to use scissors. Tr. 197. The IEP evaluated Z.R.'s reading and math skills at a third grade level. Tr. 196. Z.R.'s physical development was reported to be age-appropriate. Tr. 197. The IEP report noted that Z.R. should participate in all school activities and remain in general education classes with supportive services. Tr. 196. Z.R. was to also receive double time for classroom tests and be allowed to sit in a separate location for standardized tests. Tr. 203.

### 6.   The October 26, 2011 Teacher Questionnaire

On October 26, 2011, Hannah Collado ("Collado") and Jacqueline Burt ("Burt"), two of Z.R.'s fifth-grade teachers, completed a teacher's questionnaire for Z.R. Tr. 154-62. With respect to the "acquiring and learning information" domain, Collado and Burt found that Z.R. had "a very serious problem" in understanding and participating in class discussions, and a "serious problem" in reading and comprehending written materials, providing organized oral explanations and adequate descriptions, recalling and applying previously learned material, and applying problem solving skills in class. Tr. 156. They also rated Z.R. as

having an "obvious" problem comprehending oral instructions, understanding school and content vocabulary, expressing ideas in written form, completing class/homework assignments and learning new material. Tr. 156-57.

For the "attending and completing tasks" domain, Collado and Burt reported that Z.R. had a "very serious problem" paying attention when spoken to directly; a "serious problem" in focusing long enough to finish assigned activity or tasks, refocusing on tasks when necessary, carrying out single step instructions, completing work accurately without careless mistakes, and working at a reasonable pace/finishing on time; and an "obvious" problem in completing class and homework assignments. Tr. 157.

Collado and Burt rated Z.R. as having a "slight problem" in several activities related to interacting and relating with others, which previous questionnaires had not indicated. Tr. 158. They also rated Z.R. as having a "serious problem" in "caring for physical needs." Tr. 160.

d.   *The ALJ Decision*

The ALJ made the following determinations based on the evidence in the record and the Hearing:

1.   Z.R., a school-aged child, had not engaged in substantial gainful activity. Tr. 12.

2.   Z.R. had the following severe impairments: (1) learning disorder; (2) ADHD; (3) scoliosis; (4) asthma; and (5) hypothyroidism. Tr. 13.

3.   Z.R.'s impairments, singly or in combination, did not meet or medically equal in severity the appropriate medical findings contained in 20 C.F.R. Part 404 Appendix 1 to Subpart P. Tr. 26.

4.   Z.R. had a less than marked limitation in "acquiring and using information," a less than marked limitation in "attending and completing tasks," a less than marked limitation in "interacting and relating with others," a less than marked limitation in "moving about and manipulating objects," a less than marked limitation in "caring for yourself," and a less than marked limitation in "health and physical well being." *Id.*

5.   Z.R.'s impairments did not functionally equal in severity the appropriate medical findings contained in 20 C.F.R. Part 404, Appendix 1 to Subpart P. *Id.*

6.   Z.R.'s allegation of disability was not supported by the objective clinical findings. *Id.*

7.   Z.R. did not have a medically determinable physical or mental impairment, or combination of impairments, that results in marked or severe functional limitations. *Id.*

8.  Z.R. has not been under a "disability," as defined in the Act, at any time since December 29, 2010 through the date of the ALJ Decision. *Id.*

The ALJ found that Z.R.'s impairments did not meet or medically equal any impairment contained in the listings. Tr. 13. The ALJ evaluated Z.R.'s impairments to determine whether they were "functionally equivalent" to a listed impairment, and determined that they were not. Tr. 13-15. Specifically, the ALJ found that Z.R. had a less than marked limitation in all domains of functioning. Tr. 13-23. Because Z.R. did not have marked limitation in two domains of functioning, or an extreme limitation in one domain, the ALJ found that Z.R. was not disabled. Tr. 25, 26.

## III.  The Applicable Standard

Judgment on the pleadings may be granted under Rule 12(c) where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639 (2d Cir. 1988). A party's motion will be dismissed if, after a review of the pleadings, the court is convinced that the party does not set out factual allegations that are "enough to raise a right to relief beyond the speculative level." *Bell Atlantic Corp. v.*

25

*Twombly,* 550 U.S. 544, 570 (2007).

In reviewing a decision for disability insurance benefits, a court must determine whether (1) the Commissioner applied the correct legal standard, *see Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir. 1999); and (2) the decision is supported by substantial evidence, *see* 42 U.S.C. § 405(g); *Brown v. Apfel,* 174 F.3d 59, 61-62 (2d Cir. 1999). Substantial evidence is "more than a mere scintilla," *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)), and is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Brown,* 174 F.3d at 62-63. "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* at 62 (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir. 1983) (*per curiam*)). Substantial evidence "is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *Brault v. Soc. Sec. Admin., Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012). Under this standard, once an ALJ finds facts, a court can reject those facts "only if a reasonable factfinder would *have to conclude otherwise.*" *Id.* (quoting *Warren v. Shalala,* 29 F.3d 1287, 1290

26

(8th Cir. 1994) (emphasis in original).

A court reviewing a denial of Social Security benefits does not review *de novo* the evidence in the record. *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir. 1996); *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991). "[I]t is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir. 1998). In evaluating the evidence, "the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon *de novo* review." *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir. 1984)). If the Commissioner's decision that a claimant is not disabled is supported by substantial evidence in the record, the court must uphold the decision. 42 U.S.C. § 405(g); *Jones,* 949 F.2d at 59; *Arnone,* 882 F.2d at 34. The court must uphold a denial of benefits supported by substantial evidence even where substantial evidence may also support the plaintiff's position, *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir. 1990), or where a reviewing court's independent conclusion based on the evidence may differ from the Commissioner's. *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir. 1982), *cert denied,* 459 U.S. 1212 (1983); *Schauer v. Schweiker,* 675 F.2d 55, 57 (2d Cir. 1982). While the ALJ must set forth the

essential considerations with sufficient specificity to enable the reviewing court to determine whether the decision is supported by substantial evidence, he or she need not "explicitly reconcile every conflicting shred of medical testimony." *Mongeur v. Heckler,* 722 F.2d 1033, 1040 (2d Cir. 1983) (citing *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir. 1981)). A reviewing court gives deference to the ALJ's evaluation since he or she observed the claimant's demeanor and heard the testimony first-hand. *Pena v. Chater,* 968 F. Supp. 930, 938 (S.D.N.Y.1997), *aff'd sub nom. Mejias v. Social Security Administration,* 445 F. Supp. 741, 744 (S. D.N.Y. 1978).

### a.   *Determination of Disability*

To quality for SSI benefits, the child's income and assets (including income and assets imputed to the child from his parents) must not exceed certain maxima, 42 U.S.C. § 1382(a)(1), and the child must be "disabled." Under the Act, a child is disabled if he or she has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or is expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i). No individual under the age of eighteen who engages in substantial gainful activity may be considered to be disabled. *Id.*

28

§ 1382c(a)(3)(C)(ii).

A three step sequential evaluation is used to make this determination: (1) determine whether the child is engaged in substantial gainful activity; (2) if not, determine whether the child has a "severe impairment"; and (3) if so, determine whether the child's impairment(s) meets, medically equal, or functionally equal a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924(a), (b)-(d).

An impairment functionally equals a listed impairment if it results in either a "marked limitation" in two of six domains of functioning, or an "extreme limitation" in one domain of functioning. 20 C.F.R. § 416.926a(a). The six domains of functioning are: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating to others; (iv) moving about and manipulating objects; (v) caring for oneself; and (vi) overall health and physical well-being. *Id.* § 416.926a(b)(1)(i)-(vi), (g)-(l).

A "marked limitation" is more than moderate, but less than extreme. 20 C.F.R. § 416.926a(e)(2)(i). It arises when a child's impairment "interferes seriously with [her] ability to independently initiate, sustain, or complete activities[,]" while

29

an "extreme limitation" is one that "interferes very seriously with [her] ability to independently initiate, sustain, or complete activities." 20 C.F.R. §§ 416.926(a)(e)(2)(i), (3)(i).

## IV.  The ALJ Decision Is Supported By Substantial Evidence

### a.    The ALJ Did Not Err In Not Giving the Opinion of Dr. Lazala Controlling Weight

Treating pediatrician Dr. Lazala opined in the April 7, 2011 Report that Z.R. had marked limitations in acquiring and using information, marked limitations in attending and completing tasks, and moderate limitations in health and physical well-being. Tr. 192-94. Plaintiff contends that the ALJ erred in disregarding this report in the ALJ Decision as Dr. Lazala was Z.R.'s treating pediatrician and her opinion should be afforded controlling weight.

Under the SSA, the Commissioner must evaluate all medical opinions received. See 20 C.F.R. § 404.1527(c); see also Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993). However, "[a] treating physician's opinion must be given 'controlling weight' when it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case record.'" *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012) (quoting 20 C.F.R. § 404.1527(c)(2)). If the treating physician's opinion is not given controlling weight, the Commissioner must nevertheless determine what weight to give it by considering: (1) the length, nature, and frequency of the relationship; (2) the evidence in support of the physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) the specialization of the physician; and (5) any other relevant factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)(i-ii); *see also Schisler*, 3 F.3d at 567–69. Other physicians' opinions may be relied upon, even non-examining ones, but the same factors must be weighed as above. 20 C.F.R. § 416.927(e). "More weight must be given to a treating physician than a non-treating one and to an examining source as opposed to a non-examining source." *Petty v. Colvin*, 12 CIV. 1644 LTS RLE, 2014 WL 2465109, at *11 (S.D.N.Y. June 2, 2014); *see also* 20 C.F.R. §§ 404.1527(c)-(e), 416.927(c)-(e).

Notwithstanding the April 7, 2011 Report by Dr. Lazala, the ALJ's determination to not give the report controlling weight was supported by substantial evidence.

31

As an initial matter, the ALJ did not ignore the April 7, 2011 Report; the ALJ referenced Dr. Lazala's opinion throughout the ALJ Decision and specifically noted when the report was consistent and inconsistent with the other evidence in the record. *See, e.g.*, Tr. 15, 17. While the ALJ Decision did not explicitly identify each of the 20 C.F.R. § 404.1527 factors, explicit recitation of each regulatory factor is not necessary; only a reflection of the application of the substance of the rule must be in the decision. *Petrie v. Astrue*, 412 Fed. App'x 401, 407-09 (2d Cir. 2011) ("[W]here the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." (internal quotation marks omitted)); *see also Martinez-Paulino v. Astrue*, 11 Civ. 5485, 2012 WL 3564140, at *16 (S.D.N.Y. Aug. 20, 2012) ("It is not necessary that the ALJ recite each factor explicitly, only that the decision reflects application of the substance of the rule." (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004))). The ALJ did discuss the factors that led him to give less than controlling weight to the April 7, 2011 Report, particularly the consistency of the opinion with the record as a whole. Moreover, there is substantial evidence that the Neuroscience Center monitored Z.R.'s ADHD and not Dr. Lazala. *See* Tr. 269, 36,

44. The Neuroscience Center issued Z.R.'s Zocalin prescriptions, Tr. 296, 299, and adjusted Z.R.'s Focalin dosage. Dr. Lazala noted that Z.R. "follows with the neurologist [*i.e.*, the Neuroscience Center] every 4-6 months for the [F]ocalin." Tr. 269. Plaintiff contends that Dr. Lazala diagnosed Z.R.'s ADHD and adjusted her Focalin dosage. Pl. Br. at 5, 22. However, Dr. Lazala has only noted that Z.R.'s Focalin dosage "need[ed]" to be adjusted due to Z.R.'s loss of appetite. Tr. 265. The record does not indicate that Dr. Lazala was Z.R.'s primary care physician in treating her ADHD. Accordingly, the ALJ's decision to not give the April 7, 2011 Report and Dr. Lazala's opinion controlling weight was not a reversible error.

While the ALJ's decision to not give the opinion of Dr. Lazala controlling weight was not a reversible error, Plaintiff has also challenged the ALJ Decision's determination as to the extent of Z.R.'s limitations. Review of these determinations follows.

   b.   *The ALJ's Determination That Z.R. Had Less Than Marked*
        *Limitation in Acquiring and Using Information Is*
        *Supported By Substantial Evidence*

In evaluating a child's ability in acquiring and using information, the ALJ considers how well a child acquires or learns

33

information and how well she uses the information she has learned.
20 C.F.R. § 416.92a(g). Per the Commissioner's rules, a child of
Z.R.'s age:

> should be able to learn to read, write, and do math, and
> discuss history and science. You will need to use these
> skills in academic situations to demonstrate what you
> have learned; *e.g.*, by reading about various subjects
> and producing oral and written projects, solving
> mathematical problems, taking achievement tests, doing
> group work, and entering into class discussions. You
> will also need to use these skills in daily living
> situations at home and in the community (*i.e.*, reading
> street signs, telling time, and making change). You
> should be able to use increasingly complex language
> (vocabulary and grammar) to share information and ideas
> with individuals or groups, by asking questions and
> expressing your own ideas, and by understanding and
> responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv).


        The ALJ's determination that Z.R. had a less than marked

limitations is supported by substantial evidence. With regards to

Z.R.'s medical records, Dr. Schreiber concluded that Z.R. was

functioning "in the low average range of intelligence" based on

Z.R.'s scores on the Wechsler Intelligence Scale for Children test.

Tr. 175. Z.R. was also reading at a fourth-grade level in February

2011. Z.R. exhibited good attention and concentration during the

testing with Dr. Schreiber, spoke with reflection and

deliberation, and responded to questions in an orderly, self-

correcting style. Tr. 174. Dr. Randall, upon reviewing the medical evidence of record, found that Z.R. had less than marked limitation in this domain. Tr. 186.

The non-medical evidence also supports the ALJ's determination. Z.R. was receiving special education teacher support services, but she was placed in the general education curriculum and participated in all school activities. Maraglina indicated that while Z.R. had an obvious problem in some domains of functioning, she was rated as having no more than a slight problem with most of this domain's activities. Maraglina also reported Z.R.'s reading level improved from second to a third-grade level from January to April 2011. Tr. 138, 211.

The ALJ Decision shows that the ALJ weighed and considered the evidence for a more significant limitation in this area. *See* Tr. 14-16. The ALJ recognized that the October 2011 teacher questionnaire reported more significant limitations than the IED and the questionnaire responses of Maraglina and Plaintiff's description of Z.R.'s problems in this domain. Tr. 16. However, the ALJ's Decision that Z.R. had less than marked limitation in acquiring and using information is supported by substantial medical and non-medical evidence, and the ALJ's determination with regards to this issue is upheld. *See Jones,* 949

35

F.2d at 59 ("[T]he court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon a *de novo* review." (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984))).

c. *The ALJ's Determination That Z.R. Had Less Than Marked Limitation in Attending and Completing Tasks Is Supported By Substantial Evidence*

The "attending and completing tasks" domain is concerned with how well a child is able to focus and maintain attention and how well she begins, carries through, and finishes activities, including the pace at which she performs activities and the ease with which she changes them. 20 C.F.R. § 416.926a(h). A child of Z.R.'s age:

> should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (*e.g.*, be ready for the school bus, change clothes after gym, change classrooms) without extra reminders

and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv).

The record indicates that Z.R. had limitations in this domain, but the ALJ's determination that her limitations were lower than "marked" is supported by substantial evidence. When considering a claimant's functional ability, it is appropriate to consider the effects of medication on the claimant. 20 C.F.R. § 416.924a(b)(9)(i). "When an impairment can be controlled by medication, a claimant is not disabled unless he has a justifiable reason for refusing to take the medication." *Rushing v. Massanari*, 159 F. Supp. 2d 1315, 1319 (D. Kan. 2001) (citing *Kataria v. Callahan*, No. 97-5050, 1997 WL 603778, at *1 (10th Cir. Oct. 1, 1997); 20 C.F.R. § 416.930)). The medical records show that, following treatment with Focalin, Z.R.'s ADHD symptoms were mitigated, with marked improvement in her school performance. *See* Tr. 289, 295. Z.R.'s behavioral problems returned only when she stopped taking Focalin. *See, e.g.*, Tr. 295, 297.

The consultative examiner reports also show a less than marked limitation in Z.R.'s ability in attending and completing tasks. Dr. DePaola observed that Z.R. had a normal attention span during examination. Tr. 181. Similarly, Dr. Schreiber found that,

37

while testing Z.R.'s IQ and reading ability, Z.R.'s attention and concentration were good, her style of responding was deliberate, orderly and self-correcting, and that she was able to attend to, follow, and understand age-appropriate direction. Tr. 174, 177. Dr. Schreiber noted that Z.R. occasionally helped with household chores and was able to complete age-appropriate tasks. Tr. 177. After reviewing the medical and school records, Dr. Randall found a less than marked limitation in this domain as well. Tr. 186. Given that Z.R.'s symptoms are treatable with Focalin and the consultative examiner reports, the medical evidence supports the ALJ's determination of Z.R.'s level of limitations in this area.

Z.R.'s school records also show evidence of less than "marked" limitation in the attending and completing tasks domain. Maraglina rated Z.R. as having either "no problem" or a "slight problem" in paying attention when spoken to directly, sustaining attention during play/sports activities, carrying out single-step instructions, waiting to take turns, changing from one activity to another without being disruptive, organizing her own things or school materials, and working at a reasonable pace/finishing on time in the January 31, 2011 Teacher Questionnaire. Tr. 139. The April 28, 2011 Teacher Questionnaire similarly recognized that Z.R. had a "serious problem" in focusing long enough to finish assigned activity or task" and "completing class/homework

assignments" and an "obvious problem" in "paying attention when spoken to directly," "refocusing to task when necessary," "completing work accurately without careless mistakes," "working without distracting self or others," and working at a reasonable pace/finishing on time." Tr. 212. However, the May 4, 2011 IEP noted that Z.R. was able to complete tasks even when given multi-step directions, followed steps to complete tasks, and was applying new educational strategies learned in class. Tr. 197. The October 2011 teacher questionnaire of teachers Collado and Burt identified Z.R. as exhibiting much more limited functioning than that indicted in the IEP and the teacher evaluations of Maraglina, but the other school reports were based on significantly more experience with Z.R.: the May 4, 2011 IEP report assessed Z.R.'s functions throughout the fourth grade, Tr. 196-208, and Maraglina's reports reflected her work with Z.R. throughout the fourth-grade year, Tr. 210. By contrast, Collado's and Burt's report only reflects a few months of experience in the 2011 school year. The ALJ clearly weighed the evidence as a whole, and the ALJ's decision to give more weight to these reports, as opposed to the October 26, 2011 teacher questionnaire, is supported by substantial evidence. As such, given the medical and non-medical evidence in the record, the ALJ's determination with regards to Z.R.'s limitations in attending and completing tasks is supported by substantial evidence. *See*, *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009)

39

(the evidence cited by the ALJ is "substantial" in that "a reasonable mind might accept [it] as adequate to support a conclusion").

### d. The ALJ's Determination That Z.R. Had Less Than Marked Limitation in Interacting and Relating With Others Is Supported By Substantial Evidence

The "interacting and relating with others" domain concerns how well the child initiates and sustains emotional connections with others, develops and uses the language of her community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i).

The record shows that Z.R. regularly interacted and related with others. Maraglina reported that Z.R. had no problems in this domain. Tr. 140. Collado and Burt also found that Z.R. had no problem or a slight problem in this area. Tr. 158. The May 4, 2011 IEP Report also indicated that Z.R. was respectful, social, and enjoyed working in small groups with peers. Tr. 197. Furthermore, Drs. Schreiber, DePaola, and Randall all concluded that Z.R. related well with others and could adequately maintain social behavior. Tr. 177, 181, 186. Given the corroborating non-medical and medical evidence, the ALJ's conclusion regarding

Z.R.'s less than marked limitation in interacting and relating with others is supported by substantial evidence.

> e. *The ALJ's Determination That Z.R. Had Less Than Marked Limitation in Moving About and Manipulating Objects Is Supported By Substantial Evidence*

The "moving about and manipulating objects" domain considers how well a child moves her body from one place to another and how well she moves and manipulates objects. 20 C.F.R. § 416.926a(j); SSR 09-6p. Four separate school-based evaluations, the May 4, 2011 IEP and the three teacher questionnaires, reported that Z.R. did not have significant health or mobility issues. Tr. 141, 159, 197, 214. Other evidence indicates that Z.R. had minimal limitations in this area: Z.R. walked to school 10 blocks away from her home, Tr. 38, participated in gym, Tr. 39, played video games, Tr. 39-40, and colored and drew, *id.* The medical evidence also supports this conclusion: Dr. Lazala assessed Z.R. as having no significant limitations in this domain, Tr. 182, and Dr. DePaola's found no significant limits in motor strength or mobility upon examining Z.R, *id.* The ALJ's conclusion that Z.R. had less than marked limitation in this area was amply supported.

> f. *The ALJ's Determination That Z.R. Had Less Than Marked Limitation in Caring For Herself Is Supported By Substantial Evidence*

The "caring for one's self" domain considers how well the child maintains a healthy emotional and physical state, including how well the child satisfies her physical and emotional wants and needs in an appropriate way, copes with stress and changes in the environment, and takes cares of her own health, possessions and living area. 20 C.F.R. § 416.926a(k); SSR 09-7p. Limited functioning in this area include (i) placing non-nutritive or inedible objects in the mouth; (ii) often using self-soothing activities that are developmentally regressive (*e.g.*, thumb sucking); (iii) does not feed, toilet, or bathe age appropriately; (iv) engages in self-injurious behavior (*e.g.*, suicidal thoughts or actions or self-inflicted injury); (v) does not spontaneously enjoy activities or interests; (vi) has restrictive or stereotypical behavior; or (vii) has disturbances in eating or sleeping patterns. 20 C.F.R. § 416.926a(k)(3).

Z.R. exhibits some evidence of psychological strain. According to Plaintiff, Z.R. slept with Plaintiff each night, was moody and displayed sadness, did not pick up toys and her clothes, and exhibited obsessive-compulsive habits such as washing her hands excessively. Tr. 46-47. According to the October 2011 teacher questionnaire, Z.R. had a serious problem caring for her physical needs, specifically not eating enough food. Tr. 160.

42

However, other evidence in the record supports the ALJ's determination that these limitations were less than marked. Plaintiff reported that Z.R. performed a variety of other activities relevant to this domain, *e.g.*, being able to independently tie her shoelaces, button her clothes, bathe herself, brush her teeth, and choose her own clothing. Tr. 117. The October 2011 questionnaire similarly reported that Z.R. had no problem caring for her personal hygiene, managing her emotions and using coping skills at school. Tr. 160. Pediatricians at Briggs consistently noted that Z.R. had an appropriate mood and affect, and exhibited no psychological problems. *See, e.g.*, Tr. 263, 265. Dr. Lazala examined Z.R. in 2010 and 2011 and consistently found no weight gain or loss, and that Z.R.'s general health was normal. Tr. 255. Z.R. has never been treated for any psychological disorder. Tr. 35. Dr. Maraglina's questionnaire responses reported no problems with Z.R.'s ability to care for herself. Tr. 215, 142. Accordingly, there is substantial evidence support the ALJ's finding of a less than marked limitation in the domain of caring for herself.

g.   *The ALJ's Determination That Z.R. Had Less Than Marked Limitation in Health and Physical Well-Being Is Supported By Substantial Evidence*

The "health and physical well-being" domain relates to the physical effects of physical and mental limitations and any associated treatment or therapies on the child's health and functioning that were not considered in the evaluation of the child's ability to move about and manipulate objects. 20 C.F.R. § 416.926a(l); SSR 09-8p. This domain addresses how recurrent illnesses, the side effects of medication and the need for ongoing treatment affect the child's health and sense of physical well-being. *Id.* Examples of limitation in this domain include symptoms such as weakness, dizziness, agitation, lethargy, or psychomotor retardation; limitation in physical functioning because of treatment; exacerbation from one impairment or combination of impairments that interfere with physical functioning; medically fragile; and need of intensive medical care to maintain level of health and well-being. 20 C.F.R. § 416.920a(l)(4)(I)-(v).

Z.R. has scoliosis, asthma, and a thyroid impairment. However, there is substantial evidence that these conditions did not impact her health and physical well-being to the level of a marked limitation. Dr. Lazala, Z.R.'s treating pediatrician, found that Z.R. had only a moderate limitation in this domain. Tr. 193-94. Z.R.'s hypothyroidism was under control in 2011 and her weight was average. Tr. 259. In the May 4, 2011 IEP, it was reported that Plaintiff stated that that she had no concerns about Z.R.'s

44

physical development. Tr. 197. Dr. Randall also found that Z.R. had a less than marked limitation in this area. Tr. 187. Z.R. also fully participates in many activities related to her health and physical well-being, such as gym and walking to school. Tr. 38-39. Given the record, there is substantial evidence supporting the ALJ's determination.


## V.    Conclusion


        Based on the reasoning set forth above, Defendant's motion is granted, Plaintiff's motion is denied, and the Complaint dismissed.


        It is so ordered.


New York, NY
July 22, 2014

                                    _____
                                        ROBERT W. SWEET
                                           U.S.D.J.